## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### BECKLEY DIVISION

**PAULA K. CAWLEY,**

      **Plaintiff,**

**v.**                                         **Case No.: 5:16-cv-02216**

**CAROLYN W. COLVIN,**
**Acting Commissioner of the Social**
**Security Administration,**

      **Defendant.**

### MEMORANDUM OPINION

This is an action seeking review of the decision of the Commissioner of the Social Security Administration (hereinafter the "Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The case is presently before the Court on the parties' motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 13, 14). Both parties have consented in writing to a decision by the United States Magistrate Judge. (ECF Nos. 4, 5). The Court has fully considered the evidence and the arguments of counsel. For the reasons that follow, the Court finds that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

### I.    Procedural History

Plaintiff, Paula K. Cawley ("Claimant"), completed applications for DIB and SSI on May 8, 2013, alleging a disability onset date of April 30, 2013, (Tr. at 312, 316), due to

"nerve damage in left arm and neck, depression, bad nerves." (Tr. at 358). The Social Security Administration ("SSA") denied the applications initially and upon reconsideration. (Tr. at 63). Claimant filed a request for a hearing, which was held on May 13, 2015, before the Honorable Scott Johnson, Administrative Law Judge ("ALJ"). (Tr. at 82-120). By written decision dated June 4, 2015, the ALJ determined that Claimant was not disabled. (Tr. at 63-76). The ALJ's decision became the final decision of the Commissioner on February 5, 2016, when the Appeals Council denied Claimant's request for review. (Tr. at 8-11).

On March 9, 2016, Claimant filed the present civil action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed an Answer and a Transcript of the Proceedings on May 12, 2016. (ECF Nos. 10, 11). Thereafter, the parties filed their briefs in support of judgment on the pleadings. (ECF Nos. 13, 14). Accordingly, this matter is fully briefed and ready for disposition.

## II.    Claimant's Background

Claimant was 53 years old at the time of her alleged onset of disability and 55 years old at the time of the ALJ's decision. (Tr. at 63, 312). She completed the eleventh grade in school and communicates in English. (Tr. at 357, 359). Claimant previously worked as an assistant manager at a fast food restaurant. (Tr. at 359).

## III.    Summary of ALJ's Findings

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to

2

result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). First, the ALJ determines whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). Second, if the claimant is not gainfully employed, then the inquiry is whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). Third, if the claimant suffers from a severe impairment, the ALJ determines whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If the impairment does meet or equal a listed impairment, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). In the fourth step, the ALJ ascertains whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability and the burden shifts to the Commissioner to prove the final step. *McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). Under the fifth and final inquiry, the Commissioner must demonstrate that the claimant is able to perform other forms of substantial gainful activity, while taking into account the claimant's remaining physical

and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the ALJ "must follow a special technique" when assessing disability. 20 C.F.R. §§ 404.1520a, 416.920a. First, the ALJ evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If such impairment exists, the ALJ documents the findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in the Regulations. *Id.* §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the degree of functional limitation against the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2).

Finally, if the ALJ finds that the claimant has a severe mental impairment that neither meets nor equals a listed mental disorder, then the ALJ assesses the claimant's residual function. 20 C.F.R. §§ 404.1520a(d)(3), 416.920a(d)(3).

In this case, the ALJ determined as a preliminary matter that Claimant met the insured status requirements of the Social Security Act through December 31, 2018. (Tr. at 65, Finding No. 1). The ALJ acknowledged that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since April 30, 2013, the alleged disability onset date. (*Id.*, Finding No. 2). Under the second inquiry, the ALJ found that Claimant suffered from severe impairments of "degenerative disc disease of the lumbar and cervical spine; degenerative joint disease of the bilateral knees, status-post arthroscopic surgery on the right knee; chronic obstructive pulmonary disease (COPD); history of left wrist fracture, status-post open reduction internal fixation (ORIF); history of bilateral carpal tunnel syndrome, status-post left carpal tunnel release; and osteoarthritis of the right shoulder, status-post surgery (20 CFR 404.1520(c) and 416.920(c))." (Tr. at 65-68, Finding No. 3). Claimant also had several non-severe impairments, including major depressive disorder and generalized anxiety disorder. (*Id.*). Under the third inquiry, the ALJ concluded that Claimant's impairments, either individually or in combination, did not meet or medically equal the severity of any listed impairment. (Tr. at 68-69, Finding No. 4). Therefore, the ALJ determined that Claimant had the RFC to:

> [P]erform a range of light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can occasionally climb ramps and stairs, but never climb ladders, ropes, and scaffolds. She can occasionally balance, stoop, kneel, crouch, and crawl. She can perform frequent reaching overhead bilaterally. She could frequently handle and finger performing gross and fine manipulation bilaterally. She should avoid concentrated exposure to extreme cold, wetness, humidity, excessive vibration, and pulmonary

irritants such as fumes, odors, dusts, and gases as well as poorly ventilated areas, chemicals, and hazards such as moving machinery and unprotected heights.

(Tr. at 69-75, Finding No. 5). At the fourth step of the analysis, the ALJ found that Claimant was capable of performing past relevant work as an assistant manager at a fast food restaurant. The ALJ explained that this occupation did not require the performance of work-related activities precluded by Claimant's RFC. (Tr. at 75-76, Finding No. 6). In reaching this conclusion, the ALJ considered the testimony of a vocational expert, who noted that Claimant's past work under the Dictionary of Occupational Titles (DOT) was classified at the skilled, light exertional level. Taking into account the vocational expert testimony and comparing the Claimant's RFC with the physical and mental demands of that work, the ALJ determined that Claimant was able to perform her past relevant work as generally performed in the national economy. Therefore, the ALJ concluded that Claimant was not disabled under the Social Security Act. (Tr. at 76, Finding No. 7).

## IV.  **Claimant's Challenges to the Commissioner's Decision**

Claimant asserts that the ALJ failed to afford controlling weight to her treating physicians' opinions of her functional capacity without proper analysis and support as required by the applicable Social Security regulations and ruling (20 C.F.R. §§ 404.1524 and 416.927(d)(2)-(6) and SSR 96-2p). (ECF Nos. 13 at 1-18).

In response, the Commissioner argues that substantial evidence supports the ALJ's finding that Claimant could perform a limited range of light work. The Commissioner adds that, even if additional mental or physical limitations were warranted, the vocational expert testified that there were still light level jobs that Claimant could perform despite certain additional restrictions. (ECF No. 14 at 6-7).

## V.    Scope of Review

The issue before this Court is whether the final decision of the Commissioner denying Claimant's application for benefits is supported by substantial evidence. In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined substantial evidence as:

> Evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1972) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Court will not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Id.* Instead, the Court's duty is limited in scope; it must adhere to its "traditional function" and "scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974). Thus, the ultimate question for the Court is not whether the Claimant is disabled, but whether the decision of the Commissioner that the Claimant is not disabled is well-grounded in the evidence, bearing in mind that "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner]." *Walker v. Bowen,* 834 F.2d 635, 640 (7th Cir. 1987).

## VI.    Relevant Medical Records

The court has reviewed the Transcript of Proceedings in its entirety, including the medical records in evidence, and summarizes below Claimant's medical treatment and

evaluations that are most relevant to the issues in dispute.

### A. Medical Records

In January 2011, prior to her alleged onset of disability, Claimant fractured her left wrist in a fall at work; the fracture was surgically repaired that month. (Tr. at 498). She subsequently developed carpal tunnel syndrome and underwent carpal tunnel release surgery in May 2012. (*Id.*). Also prior to her alleged onset of disability, Claimant was diagnosed with major depressive disorder and generalized anxiety disorder. (Tr. at 653, 669). She was treated by psychiatrist, Safiullah Syed, M.D., and prescribed Xanax, Celexa, and Ambien. (Tr. at 653, 654, 669).

In January 2013, Claimant saw internist, Wadih Kabbara, M.D., for follow-up; Dr. Kabbara documented that he had not seen Claimant in a couple of years. (Tr. at 621). On this visit, she complained of pain radiating from the left side of her neck to her left wrist and noted that her left arm sometimes became tense. (*Id.*). She had decreased range of motion in her left wrist. (*Id.*). Dr. Kabbara believed Claimant's left wrist pain could be secondary to her prior fracture, from other causes, or could be neuropathic. (Tr. at 622). He recommended an x-ray, a nerve conduction study, and blood work. He also planned to obtain approval for a pain relief cream. (*Id.*). Claimant's x-ray showed degenerative changes in her wrist and the metallic plate and screw from her prior surgery, but no acute fracture or dislocation. (Tr. at 672).

Claimant saw Dr. Kabbara again the following month. She had decreased motion in her left thumb and wrist, but no significant swelling. (Tr. at 623). Also that month, Claimant presented to Beckley Appalachian Regional Healthcare with lightheadness and blurry vision. (Tr. at 541). An examination revealed no issues with regard to her extremities, and she had normal range of motion, motor strength, and sensation. (Tr. at

542).

In March 2013, Dr. Kabbara referred Claimant to neurologist, Barry K. Vaught, M.D., for evaluation of her left arm pain and tingling. (Tr. at 498). Claimant stated that she had been doing well until recently. (*Id.*). She reported pain and occasional weakness in her arm, residual pain in her left wrist and arm, and mild reduced grip strength. (*Id.*). Claimant was slightly hyperreflexic on examination, but stated that she had always been that way. (*Id.*). Her motor strength was 5/5 in all extremities and her muscles were of normal bulk and tone. (*Id.*). Claimant reported reduced sensation in her left hand, but her reflexes were normal throughout. (*Id.*). Her nerve conduction study showed no evidence of radial neuropathy, but there was median neuropathy on the left and mild bilateral carpal tunnel syndrome. Claimant was instructed to begin wearing nighttime wrist splints. (Tr. at 499-501). Later that month, Claimant reported to Dr. Syed's office that she was "doing ok with her medications," but still had a lot of problems with her wrist and did not feel like her job was "treating her right" over it. (Tr. at 668). Claimant's objective psychiatric examination was normal, and her psychological diagnoses and medications remained the same. (*Id.*).

In April 2013, the month that she allegedly became disabled, Claimant presented to Dr. Kabbara. She appeared to be very anxious and upset over losing her job. (Tr. at 626). Claimant reported that she had been "setup" at work and "had to be fired." (*Id.*). However, she denied having any symptoms of depression. (*Id.*). Claimant's musculoskeletal examination revealed no tenderness or joint swelling. (*Id.*). She also saw Dr. Syed in April and stated she was "not doing well," was stressed out, anxious, nervous, depressed, irritable, and angry. (Tr. at 666). She elaborated that an employee that she was training to be her assistant "set her up for a $50 theft" and had told others that he was

9

going to do it. (*Id.*). Dr. Syed wrote a note, stating that Claimant could not work secondary to her physical and psychiatric condition for about a year. (*Id.*). Nevertheless, Claimant's psychological diagnoses and medications remained the same. (*Id.*).

In May 2013, Claimant reported to Dr. Kabbara that she still had anxiety and pain in different joints, but denied depression. (Tr. at 628). Dr. Kabbara's impression was arthritis in different joints and anxiety. (*Id.*). Claimant was given refills for Norco and Xanax and was also prescribed Citalopram. (Tr. at 629).

In June 2013, Claimant reported to Dr. Syed's office that she was "doing okay with her medicine when she could afford to get it." (Tr. at 652). She stated that she was under a lot of stress and trying to get disability and a medical card. (*Id.*). She said that she had a lot of problems with her arm. (*Id.*). Her diagnoses and medications were unchanged. (*Id.*).

Claimant also saw Dr. Vaught in June and continued to complain of hand pain, with burning and tingling in her hand and arm. (Tr. at 505). Dr. Vaught stated that some measure of Claimant's hand pain was due to a median nerve injury, but the nerve conduction study showed that her condition was improving. (*Id.*). To reduce the neuropathic component, Dr. Vaught started Claimant on Neurontin. (*Id.*). Claimant's nerve conduction study showed mild median neuropathy at the wrists consistent with carpal tunnel syndrome. (Tr. at 506).

In July 2013, Claimant reported to Dr. Kabbara that she still had pain in her wrist. She had seen an orthopedic surgeon, who stated that he could not do anything for her, but she also saw Dr. Vaught, who put her on Neurontin. (Tr. at 630). Claimant had arthralgia and decreased motion in her left wrist, but no arthritis or other musculoskeletal issues. (*Id.*). Dr. Kabbara planned was to continue Claimant's Norco for pain control. (Tr. at 631).

During her visit with Dr. Kabbara in August 2013, Claimant denied having any anxiety, but reported that she did have depression. (Tr. at 633). She also reported arthralgia, but no arthritis, joint tenderness, or swelling. (*Id.*). Dr. Kabbara concluded that Claimant's chronic wrist pain was potentially caused by a neuropathy. (Tr. at 634). His plan was to continue Norco for pain. (*Id.*).

In September, Claimant saw Dr. Kabbara for back pain. (Tr. at 635). She had no arthralgia or arthritis, and no other musculoskeletal issues were noted. (*Id.*). Claimant was advised not to carry heavy objects or crawl. (Tr. at 636). Norco was continued for pain relief. (*Id.*). The same month, Claimant saw Dr. Syed and again stated that she was "not doing well" and had been depressed, anxious, and nervous. (Tr. at 670). She related that she had financial problems and her daughter was experiencing health problems. (*Id.*). She was seeking a medical card and social security disability and had retained a lawyer to sue her former employer Kentucky Fried Chicken ("KFC"). (*Id.*). Dr. Syad decided to wean Claimant off Celexa within a week, start Viibryd, and continue Ambien and Xanax. (*Id.*). She was told to return to the clinic in three months. (*Id.*).

In October 2013, Claimant presented to Dr. Vaught's office. (Tr. at 507). She stated that her left hand was the same, and she still had tingling in her wrist, as well as soreness and sometimes swelling in that area. (*Id.*). Claimant was tolerating Neurontin well and felt it helped reduce her pain. (*Id.*). She still had normal motor strength, bulk, and tone in all extremities, as well as normal reflexes, but she reported reduced sensation in her left hand. (*Id.*). Since her left hand pain symptoms had not worsened, her EMG and nerve conduction study were not repeated, but the dosage of Neurontin was increased. (Tr. at 508).

In December 2013, Claimant presented to the Thomas Memorial Hospital

Emergency Room complaining of right shoulder pain. (Tr. at 522). She stated that it started two years prior, but recently became worse after she fell at home. (*Id.*). On examination, Claimant had moderate tenderness and limited range of motion due to pain in her right shoulder, but her extremities were otherwise negative for any other issues. (Tr. at 523). Claimant stated that she had x-rays at her primary care provider the prior week and was told that she had arthritis. She was given Ultram, but it was not helping with the pain. (*Id.*). Claimant was discharged the same day with a prescription for Flexeril to take as needed for muscle spasm. She was instructed to apply ice, limit lifting, not work for two days, and continue her present medications. (Tr. at 524).

In January 2014, Claimant was referred by Dr. Vaught to Lana D. Christiano, M.D., at Neurological Associates, Inc. for a musculoskeletal examination. (Tr. at 515). Claimant complained of pain in her right shoulder that extended into her neck and upper arm. (*Id.*). She had no numbness, tingling, weakness, or pain in her lower portions of her arms. (*Id.*). She had normal strength, tone, sensation, and reflexes in all of her extremities. (Tr. at 517).

Several months later, in March 2014, Claimant underwent arthroscopic shoulder surgery. (Tr. at 525). By May 2014, Claimant stated that her shoulder was "doing great." (Tr. at 651). She was released from physical therapy into a home exercise program and was pleased with her progress. (*Id.*). However, that same month, Claimant presented to Dr. Syed's office for follow-up and stated that she continued to have a lot of problems with chronic pain and her psychiatric conditions. (Tr. at 675). Claimant again mentioned that she was trying to obtain social security disability benefits and requested a mental assessment form to submit. (*Id.*). She stated that she could not deal with large crowds or the public and when she felt stressed, she tended to "blow up" and had a lot of anger issues

and irritability. (*Id.*). Despite Claimant's statements, Dr. Syad noted that Claimant's anxiety seemed to be well controlled. (*Id.*). He decided to continue Claimant's prescriptions of Viibyrd, Xanax, and Ambien, and add Abilify. (*Id.*). She was instructed to return in three months. (*Id.*).

Also in May 2014, Claimant presented to Dr. Vaught's office, reporting continued tingling in her left wrist and fingers and weak grip on the left. (Tr. at 511). She stated that she was wearing the neutral position splints at night. (*Id.*). On examination, Claimant had normal motor strength, bulk, and tone in all extremities and normal reflexes, but had reduced sensation in her left hand. (*Id.*). She was to continue taking Neurontin as it was helping and to continue wearing her wrist splints at night. (Tr. at 512).

In August 2014, Claimant presented to Dr. Syed's office for follow-up and reported that her medications were "working out alright," and she was better since starting Abilify. (Tr. at 689). She had financial stressors, but was calmer, had no major mood swings, her depression was improved, and she was able to stay up and stay busy. (*Id.*). She was to continue the same medications and follow-up in three months, or sooner, if needed. (*Id.*).

In September 2014, Claimant presented to a neurosurgeon for evaluation of her neck pain that she stated began two years earlier after a fall at work. (Tr. at 682). Claimant denied pain or numbness in her arms and denied electric shock-like sensations, but complained of weakness and tingling in her left hand and reported dropping objects. (*Id.*). She confirmed that she wore neutral position splints at night. (*Id.*). Claimant alleged that any type of activity exacerbated pain, and nothing improved it, although her recent shoulder surgery had improved her shoulder pain and range of motion. (*Id.*). Claimant denied decreased interest/pleasure in doing things or feeling down, depressed, or hopeless, and her mental status was normal. (Tr. at 684). Claimant's musculoskeletal

13

examination showed no swelling, deformity, or tenderness, and her range of motion was normal in all joints except her neck. (Tr. at 685). Her strength was normal throughout, and her hand grips were strong and equal bilaterally. (*Id.*). Claimant was assessed with neck pain and tremors for which she was to receive follow-up testing. (*Id.*). Surgery was not recommended for her neck pain, but interventional pain therapy was suggested. (*Id.*).

Later that month, Claimant saw Dr. Vaught for neck pain. (Tr. at 699). As far as carpal tunnel syndrome, Claimant continued to wear her splints and stated that driving or talking on the telephone worsened her symptoms. (*Id.*). She exhibited normal muscle strength, bulk, and tone; reduced sensation in left hand; and had normal reflexes throughout with no Babinski sign. (*Id.*). Dr. Vaught questioned whether the tremor was related to Claimant taking Abilify. (Tr. at 700). She was to continue taking Neurotin for pain and was referred to Dr. Bowman for pain control. (*Id.*).

On the same date, Claimant presented to Dr. Syed's office for an early visit to discuss Abilify and its capacity to cause tremors, at Dr. Vaught's request. (Tr. at 690). She had a tremor in her head and neck, but none in her hands. (*Id.*). Dr. Syed discontinued Abilify, although he cited to a medical note suggesting that she had the tremors before starting Abilify. Dr. Syed believed that Claimant's tremor was possibly caused by anxiety. (*Id.*). Cogentin was added to help with the tremor and stiffness-related issues. (*Id.*). Claimant was to continue taking Ambien, Viibryd, and Xanax. (*Id.*). By the following month, Claimant's head tremor had improved, and her jaw tremor was no longer present. (Tr. at 701). Claimant's carpal tunnel syndrome was stable. (*Id.*).

In January 2015, Claimant presented to Dr. Syed's office earlier than her scheduled appointment and again stated that she was "not doing well." (Tr. at 692). She reported that she was arguing a lot with her husband and that he tore up her prescriptions. (*Id.*).

She was instructed to continue taking Viibryd, Xanax, and Ambien and to return for her regularly scheduled appointment in a month or sooner, if needed. (*Id.*). Also that month, Claimant reported to Dr. Kabbara that she still had tremors, but no musculoskeletal issues were noted on examination. (Tr. at 710-11).

In February 2015, Claimant saw Dr. Syed and reported that she was doing "fair." (Tr. at 693). She reported multiple stressors; including, her and her husband's health problems, a dispute with her brother, financial issues, and trying to obtain social security disability benefits. (Tr. at 693). Claimant was worried, but had fair memory, insight, and judgment. (*Id.*). She was to continue her present medications. (*Id.*).

In March 2015, Claimant presented to Dr. Vaught's office for follow-up; since her last visit, Claimant had injections in her cervical spine, which improved her range of motion. (Tr. at 703). She continued wearing her wrist splints and had no worsening of her carpal tunnel syndrome. (*Id.*). Claimant exhibited normal motor strength, bulk, and tone and normal reflexes, but reduced sensation in her left hand. (*Id.*). Her tremors had completely resolved. (*Id.*). Claimant also saw Dr. Kabbara that month. Her depression and anxiety were under control. (Tr. at 717). No issues were noted with regard to her musculoskeletal examination during that visit or the following month. (*Id.*; Tr. at 727). Also in March 2015, Claimant had a psychotherapy session with Nancy Sotak. (Tr. at 723). Claimant reported that she was overwhelmed by stressors such as health problems and family issues. (*Id.*). Her mood was depressed and anxious, and her affect was tearful. (*Id.*).

In May 2015, Claimant reported to Dr. Syed's office that she was "doing okay with her medications." (Tr. at 724). She was arguing with her husband, but they had been getting along better the past couple of days. (*Id.*). Claimant was told to continue Viibryd, Xanax, and Ambien. (*Id.*). Later that month, Claimant presented to Dr. Syed's office,

complaining of stress over the outcome of her disability hearing. (Tr. at 725). She also reported that she continued to struggle with pain and limitations. (*Id.*). Her mood was depressed and anxious, and her affect was flat. (*Id.*). She also saw Dr. Kabbara and had no musculoskeletal issues other than edema in her legs. (Tr. at 729).

In June 2015, Claimant saw Dr. Kabbara. (Tr. at 30). Her depression and anxiety were under control, and she was seeing a psychiatrist. (*Id.*). Her musculoskeletal examination showed no misalignment, tenderness, or joint swelling. (*Id.*). Claimant also had a psychotherapy session. (Tr. at 19). Her chief complaints were depression, anxiety, and irritable mood. (*Id.*). She was confused and upset that her social security disability claim was denied. (*Id.*). She stated that she could not work due to her back, neck, wrist, and knee problems. (*Id.*). Her diagnoses were recurrent, moderate major affective illness and anxiety disorder. (*Id.*). She reported that her psychotropic medications were beneficial. (*Id.*).

In August 2015, Claimant saw Dr. Kabbara for follow-up, noting that she stopped Abilify due to side effects. (Tr. at 32). Her musculoskeletal examination showed no misalignment, tenderness, or joint swelling. (*Id.*). Her major problems were depression and anxiety. (Tr. at 33). She was to continue taking her depression and anxiety medication. (*Id.*). During a psychotherapy session that month, Claimant reported issues with her spouse. (Tr. at 21). Her diagnoses remained the same. (*Id.*).

In September 2015, Claimant presented to Dr. Vaught's office, reporting increased numbness and tingling in the first, second, and third digits of her right hand, but no weakness. (Tr. at 44). She had normal motor strength in her extremities, reduced sensation in left hand, and normal reflexes. (*Id.*). During her psychotherapy session that month, Claimant stated that things were better at home, which helped. (Tr. at 23). She

stated that she could not work due to physical issues "as well as her mind," also stating that she was unable to handle stress. (*Id.*). She expressed anger over not being able to work. (*Id.*).

The following month, Claimant reported during a psychotherapy session that she was experiencing increased pain, which, in turn, was increasing her anxiety and depression. (Tr. at 24). She stated that she changed her mind about having neck surgery because she could not hold her head up and was desperate for relief. (*Id.*). Her mood was anxious and her affect was pleasant. (*Id.*). The diagnoses were major depressive disorder and anxiety. (*Id.*).

Also in October 2015, Claimant saw Dr. Vaught. Her nerve conduction study showed bilateral carpel tunnel syndrome that was mild and had not worsened significantly since the previous study. (Tr. at 46). She was told to continue using her wrist splints and follow up in six months. (*Id.*).

In November 2015, Claimant saw Dr. Kabbara and still had no misalignment, tenderness, or joint swelling on her musculoskeletal examination. (Tr. at 38). During her monthly psychotherapy session, Claimant reported that she was worried about her medical issues, had up and downs with her spouse, and had limitations that affected her daily living and caused frustration. (Tr. at 25). The next month, Claimant reported during psychotherapy that she was devastated over the death of her younger brother who died in his sleep. (Tr. at 26). However, her diagnoses remained the same. (*Id.*). Finally, in January 2016, Claimant continued to express grief regarding her brother's death, as well as anxiety over the possibility that her spouse's cancer was recurring. (Tr. at 27). Her diagnoses remained the same. (*Id.*).

### B. Consultative Assessments and Other Opinions

Prior to Claimant's alleged onset of disability, on October 20, 2011, Claimant had an independent medical examination by Robert P. Kropac, M.D., following a work-related injury. (Tr. at 427). She complained of left wrist pain and intermittent numbness in her left thumb. (*Id.*). She related that on January 9, 2011, she sustained an injury at work in which she fell and fractured her left wrist. (Tr. at 427-28). After seven weeks, she returned to her job as an assistant manager at KFC in a light duty capacity with a cast on her wrist. (*Id.*). After her cast was removed, she developed numbness and tingling in her left hand. (Tr. at 428). Her neurologist diagnosed her with carpal tunnel syndrome and performed a carpal tunnel release on September 2, 2011. (*Id.*). After two weeks, she returned to work on light duty and continued to the present time. (*Id.*). She was on no medication. (*Id.*). Her examination revealed deformity of the left wrist because of the fracture. (Tr. at 429). She had normal range of motion in her fingers and thumb, but she had limited range of motion of the left wrist and forearm. She did not complain of pain in her wrist when the range of motion was passively extended, and she had no crepitation on ranging of the wrist, although she had some tenderness to palpation in her left wrist. (*Id.*). She had normal muscle strength in her extremities, including in her left hand, wrist, and forearm. (Tr. at 430). She did complain of pain when her left wrist was tested against resistance. (*Id.*). Her reflexes were normal and her sensation was grossly intact, including in her left hand. (*Id.*). Her Phalen and Allen tests were negative, and there was no Tinel's sign in her left wrist. (*Id.*). Grip strength was reduced in her left hand with complaints of wrist pain. (*Id.*). Her x-ray showed a healed left wrist fracture. (*Id.*). Dr. Kropac's diagnosis was a healed left wrist fracture with secondary carpal tunnel syndrome that was resolved by release surgery. (Tr. at 433).

On July 22, 2013, Joseph Richard completed a Psychiatric Review Technique (PRT) based upon a review of Claimant's records. He assessed that Claimant had no restriction in activities of daily living; mild restriction in social functioning and concentration, persistence, or pace; and no episodes of decompensation of extended duration. (Tr. at 145). He opined that Claimant should be able to participate in work-like activities in a low stress work environment that made accommodations for her physical limitations. (Tr. at 146). He found Claimant only partially credible, because her statements of pain and functioning seemed exaggerated in relation to the evidence. (Tr. at 146-47).

On August 16, 2013, consultative examiner Mustafa Rahim, M.D., examined Claimant in connection with her claim for social security benefits. (Tr. at 489). She was taking Neurontin for nerve damage. (*Id.*). Claimant's grip was 4/5 in her left hand and 5/5 in her right hand. (Tr. at 490). Her reflexes and sensation were intact. (*Id.*). All of her joints had full range of motion except that her wrist joints were "a little restricted." (*Id.*). The assessment was, *inter alia*, posttraumatic arthritis of the left wrist, carpal tunnel syndrome status post surgery, neuropathy in the left upper extremity per her description, depression, and anxiety. (*Id.*).

Upon a review of Claimant's records, Narendra Parikshak, M.D., assessed on October 14, 2013 that Claimant had the RFC to perform light work with postural and environmental limitations. (Tr. at 147-48). Dr. Parikshak noted that there was clinical evidence of limitations in Claimant's left wrist, but she had no manipulative limitations. (Tr. at 148). Dr. Parikshak opined that Claimant could perform her past relevant work as an assistant manager as she actually performed it. (Tr. at 149). Dr. Parikshak also found Claimant only partially credible because her statements of pain and functioning seemed

exaggerated in relation to the evidence. (Tr. at 146-47). On January 7, 2014, Caroline Williams, M.D., affirmed Dr. Parikshak's assessment and findings. (Tr. at 208-11). Dr. Williams noted that Claimant was not fully credible in that the alleged symptoms and subsequent alleged disability were inconsistent with the medical evidence in the file. (Tr. at 208).

At the reconsideration level, James W. Bartee, Ph.D., found on January 3, 2014 that Claimant had mild restriction in activities of daily living and agreed with the previous assessment that she had mild restriction in social functioning and concentration, persistence, or pace, and no episodes of decompensation of extended duration. (Tr. at 207). He agreed that Claimant could work in a low stress environment that accommodated her physical limitations. (*Id.*). He found that Claimant's limited mental allegations seemed mostly credible. (Tr. at 208).

On January 30, 2014, Dr. Syed completed a Medical Assessment of Ability To Do Work-Related Activities (Mental) form. (Tr. at 519-21). On a scale of "unlimited, good, fair, poor, and none," he opined that Claimant had a fair ability to follow work rules; use judgment; function independently; understand, remember, and carry out simple instructions; maintain personal appearance; and relate predictably in social situations, but had a poor ability to relate to co-workers; deal with the public; interact with supervisor(s); deal with work stresses; maintain attention/concentration; understand, remember, and carry out detailed or complex job instructions; behave in an emotionally stable manner; and demonstrate reliability. (Tr. at 519-20). He noted that Claimant had ongoing symptoms of major depression and generalized anxiety that affected her reliability and dependability, had poor concentration that negatively affected her ability to participate in sustained activities, and had ongoing emotional issues. (Tr. at 520-21).

20

Further, he opined that her psychological conditions associated with her chronic pain severely affected her ability to engage in substantial gainful activity. (Tr. at 521).

## VII. <u>Discussion</u>

Claimant asserts that the ALJ improperly analyzed the evidence in this case and failed to afford controlling weight to her treating physicians' opinions of her functional capacity without proper analysis and support as required by the applicable Social Security regulations and ruling (20 C.F.R. §§ 404.1524 and 416.927(d)(2)-(6) and SSR 96-2p). (ECF Nos. 13 at 1-18). Specifically, Claimant argues that the ALJ improperly rejected (1) the findings of her psychiatrist, Dr. Syed, regarding the functional effects of her depression and anxiety as stated in the Medical Assessment of Ability to do Work-Related Activities (Mental) and (2) the opinions of Drs. Levin, Kabbara, and Soulsby relating to her manipulative impairments. (*Id.*).

When evaluating a claimant's application for disability benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R. §§ 404.1527(b), 416.927(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [her] symptoms, diagnosis and prognosis, what [she] can still do despite [her] impairment(s), and [her] physical or mental restrictions." *Id.* §§ 404.1527(a)(2), 416.927(a)(2). The regulations outline how the opinions of accepted medical sources will be weighed in determining whether a claimant qualifies for disability benefits. *Id.* §§ 404.1527(c), 416.927(c). In general, the ALJ should give more weight to the opinion of an examining medical source than to the opinion of a non-examining source, and even greater weight to the opinion of a treating physician, because that

physician is usually most able to provide a detailed, longitudinal picture of a claimant's alleged disability. *Id.* §§ 404.1527(c)(1)-(2), 416.927(c)(1)-(2). A treating physician's opinion on the nature and severity of an impairment may be afforded controlling weight when the following two conditions are met: (1) the opinion is well-supported by clinical and laboratory diagnostic techniques and (2) the opinion is not inconsistent with other substantial evidence. *Id.* When a treating physician's opinion is not supported by clinical findings, or is inconsistent with other substantial evidence, the ALJ may give the physician's opinion less weight. *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must analyze and weigh all the medical opinions of record, taking into account the following factors: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6). The ALJ must provide "specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record." SSR 96-2p, 1996 WL 374188, at *5 (S.S.A. 1996). "Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected ... In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." *Id.* at *4. On the other hand, when there is persuasive contrary evidence in the record, a treating physician's opinion may be rejected in whole or in part. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Generally, the

more consistent a physician's opinion is with the record as a whole, the greater the weight an ALJ will assign to it. *Id.* §§ 404.1527(c)(4), 416.927(c)(4). Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays*, 907 F.2d at 1456.

Medical source statements on issues reserved to the Commissioner, however, are treated differently than other medical source opinions. SSR 96-5p, 1996 WL 374183 (S.S.A. 1996). In both the Regulations and SSR 96-5p, the SSA explains that "some issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability;" including the following:

> 1. Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;
>
> 2. What an individual's RFC is;
>
> 3. Whether an individual's RFC prevents him or her from doing past relevant work;
>
> 4. How the vocational factors of age, education, and work experience apply; and
>
> 5. Whether an individual is "disabled" under the Act.

*Id.* at *2. "The regulations provide that the final responsibility for deciding issues such as these is reserved to the Commissioner." *Id.* As such, a medical source statement on an issue reserved to the Commissioner is never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled." *Id.*

at *2. Still, these opinions must always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole. *Id.* at *3.

If conflicting medical opinions are present in the record, the ALJ must resolve the conflicts by weighing the medical source statements and providing an appropriate rationale for accepting, discounting, or rejecting the opinions. *See Diaz v. Chater,* 55 F.3d 300, 306 (7th Cir. 1995). A minimal level of articulation of the ALJ's assessment of the evidence is "essential for meaningful appellate review;" otherwise, "'the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.'" *Zblewski v. Schweiker,* 732 F.2d 75, 79 (7th Cir. 1984) (citing *Cotter v. Harris,* 642 F.2d 700, 705 (3rd Cir. 1981)). Although 20 C.F.R. §§ 404.1527(c),416.927(c) provide that in the absence of a controlling opinion by a treating physician, all of the medical opinions must be evaluated and weighed based upon the various factors, the regulations do not explicitly require the ALJ to regurgitate in the written decision every facet of the analysis. Instead, the regulations mandate only that the ALJ give "good reasons" in the decision for the weight ultimately allocated to medical source opinions. *Id.* §§ 404.1527(c)(2), 416.927(c)(2).

### A. Mental Impairments

In this case, Claimant's psychiatrist Dr. Syed opined in April 2013 that Claimant was "unable to work secondary to her physical and psychiatric condition for about a year." (Tr. at 666). Dr. Syed also later completed a Medical Assessment of Ability to do Work-Related Activities (Mental) form in January 2014 ("medical assessment form"). (Tr. at 519-21). On the scale of "unlimited, good, fair, poor, and none," Dr. Syed opined that Claimant had a fair ability to follow work rules; use judgment; function independently;

understand, remember, and carry out simple instructions; maintain personal appearance; and relate predictably in social situations, but had a poor ability to relate to co-workers; deal with the public; interact with supervisor(s); deal with work stresses; maintain attention/concentration; understand, remember, and carry out detailed or complex job instructions; behave in an emotionally stable manner; and demonstrate reliability. (Tr. at 519-20). He noted that Claimant had ongoing symptoms of major depression and generalized anxiety that affected her reliability and dependability, had poor concentration that negatively affected her ability to participate in sustained activities, and had ongoing emotional issues. (Tr. at 520-21). Further, he stated that her psychological conditions associated with her chronic pain severely affected her ability to engage in substantial gainful activity. (Tr. at 521).

In the decision, the ALJ discussed Dr. Syed's above opinions, but ultimately determined to afford them little weight on the basis that they were not consistent with the record as a whole or supported by the relevant evidence. (Tr. at 74). The ALJ further determined that Dr. Syed's progress notes did not support the limitations described in the medical assessment form, and his opinion about Claimant's inability to work pertained to an issue that was reserved to the Commissioner. (Tr. at 75).

Although not directly included in the paragraph discussing Dr. Syed's opinions, the ALJ cited the specific evidence that informed his decision regarding Claimant's mental impairments. The ALJ noted that while Claimant was diagnosed with major depressive and generalized anxiety disorders, she received only medication management, her symptoms appeared adequately controlled, and she did not require any emergency room visits or inpatient hospitalizations for symptom exacerbations. (Tr. at 66). The ALJ also cited that Claimant reported in August 2014 that she no longer had mood swings, and she

was able to stay up and stay busy. (Tr. at 66-67). Further, the ALJ pointed out that in September 2014, Claimant denied any decreased interest or pleasure in doing things and did not feel down, depressed, or hopeless. (Tr. at 67). Accordingly, the ALJ found that Claimant's mental impairments did not cause more than minimal work-related limitations. (*Id.*). The ALJ acknowledged that Claimant was treated for anxiety and depression since 2009, but noted that she only saw her psychiatrist six times per year for medication management, did not receive counseling until the month prior to the decision, and she denied having panic attacks. (Tr. at 70).

The undersigned finds that ALJ's decision articulates sufficient justification for affording little weight to Dr. Syed's opinions. The ALJ was not required to explicitly discuss his analysis of each factor listed in 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6), but rather, he was obligated to provide "good reasons" in the decision for the weight ultimately allocated to medical source opinions. *Id.* §§ 404.1527(c)(2), 416.927(c)(2); *see, e.g., Hayslett v. Colvin*, No. 7:14CV00631, 2016 WL 1296080, at *7 (W.D. Va. Mar. 30, 2016) (A "point-by-point analysis" of the treating physician factors is not required; rather, the ALJ must provide appropriate reasons for the weight given to the treating physician's opinions and the court's role is to defer to those decision unless they are unsupported by substantial evidence); *Burch v. Apfel,* 9 F. App'x 255, 259 (4th Cir. 2001) (no error where the ALJ's "order indicates consideration of all the pertinent factors"); *Seneca v. Colvin,* No. TMD12–1183, 2013 WL 6713182, at *2 (D. Md. Dec. 18, 2013) (declining to find error where the ALJ's reasoning reflected consideration of the factors despite his failure to engage in a "formulaic recitation"); *Foster v. Colvin,* No. JKS–12–1957, 2013 WL 3448036, at *4 (D.Md. July 8, 2013) ("[T]here is no requirement to analyze opinions factor-by-factor so long as the ALJ applied the proper legal standard substantively"); *and*

*Hooks v. Astrue,* No. SKG–11–423, 2012 WL 2873944, at *8 (D. Md. July 12, 2012) (finding that implicit consideration of the factors sufficed to satisfy Fourth Circuit precedent).

Undoubtedly, the ALJ provided well-supported reasons for the weight that he gave to Dr. Syed's opinions. The ALJ referenced the length and nature of Claimant's treatment, noting that Claimant went to Dr. Syed's office six times per year to receive medication, but only began receiving counseling just prior to the ALJ's decision. Further, the ALJ concluded that Dr. Syed's opinion was unsupported by the evidence of record, including Dr. Syed's own treatment records, and the ALJ's decision refers to specific pieces of evidence that supported those findings.

The United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") recently considered a case in which an ALJ afforded little weight to a treating physician's opinion of the claimant's limitations on the basis that the opinion not supported by the physician's office notes or the other evidence. *Sharp v. Colvin*, ___ F. App'x___, 2016 WL 6677633 at *4-*5 (4th Cir. 2016). The Fourth Circuit held that such rationale was a sufficient basis to discredit the treating physician's opinion, noting that while the ALJ did not cite specific pages in the record that were inconsistent with the treating physician's opinion, the ALJ's explanation relied on and identified a particular category of evidence [the office notes] and the record indeed contained substantial evidence supporting the ALJ's conclusion that the treating physician's opinion did not merit controlling weight. *Id.* at *5. The Fourth Circuit emphasized that it is not the province of the court to reweigh evidence; instead, the court must defer to the ALJ's determination when, as in Sharp's case, conflicting evidence might lead reasonable minds to disagree whether a claimant is disabled. *Id.* (citations omitted).

Like the ALJ in *Sharp*, the ALJ in this case "did not summarily conclude" that Dr. Syed's opinions merited little weight, but undertook an analysis of Claimant's treatment notes and the other evidence in the record to determine whether Dr. Syed's opinions of Claimant's mental limitations were substantiated. Also like *Sharp*, the ALJ's conclusion that Dr. Syed's opinions should not be accorded controlling weight is supported by substantial evidence. Claimant's records reflect diagnoses of major depressive disorder and generalized anxiety disorder; however, she was treated conservatively with only medications, which were generally repeatedly continued on the same course and noted to be beneficial. (Tr. at 19, 652, 666, 668, 670, 675, 689, 692, 693, 724). As the ALJ pointed out, Claimant did not begin receiving mental health counseling until at least two years after her alleged onset of disability, although she was treating with Dr. Syed during that time. Further, throughout the relevant period, Claimant's anxiety and depression were noted many times to be well controlled or nonexistent. (Tr. at 487, 628, 633, 675, 684, 717, 724).

In addition, two consulting state agency psychologists reviewed Claimant's records and opined that Claimant was no more than mildly limited in activities of daily living; social functioning; and maintaining concentration, persistence, or pace; and had no episodes of decompensation of extended duration (the "paragraph B" criteria). (Tr. at 145, 207). They agreed that Claimant could work in a low stress work environment that made accommodations for any of her physical limitations. (Tr. at 146, 207). The ALJ assigned these opinions great weight and utilized the opinions and other evidence in thoroughly analyzing Claimant's functioning with respect to each of the paragraph B criteria. (Tr. at 67-68). The Court recognizes that the ALJ did not include in Claimant's RFC a limitation to a low stress environment despite giving great weight to the state psychologists'

opinions. Although the ALJ accorded great weight to the opinions, "he was not required to adopt every single opinion set forth in their reports." *Laing v. Colvin*, No. SKG-12-2891, 2014 WL 671462, at *10 (D. Md. Feb. 20, 2014) (citing *Bruette v. Comm'r Soc. Sec.*, No. SAG–12–1972, 2013 WL 2181192, at *4 (D.Md. May 17, 2013) (stating that, where an ALJ has considered the entire record, he is not required to adopt every finding of a doctor to whose opinion he assigned "significant weight").

In light of the state psychologists'' opinions, compounded by Dr. Syed's opinions, the ALJ could have better explained his determination to not include a limitation to a low stress environment. Nevertheless, in this case, the discrepancy was at most harmless error. *See generally Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) (citations omitted) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result."). The vocational expert testified during the hearing that a hypothetical individual with a RFC even more limited than what the ALJ assigned to Claimant could still perform several light level positions even if she was additionally restricted to a low stress environment; occasional contact with co-workers, supervisors, and the public; no fast-paced production; simple, routine, repetitive tasks with simple decision making; and few occupational changes in the work setting. (Tr. at 117). In fact, the expert stated that the hypothetical individual could still work in two of the jobs even if she were limited to no contact with the public. (Tr. at 118).

Overall, the ALJ thoroughly analyzed and weighed all of the available evidence and provided well-grounded reasons for his determinations. The record supports his conclusions. The evidence indicates that Claimant sometimes reported depressive symptoms, anxiety, and other psychological symptoms in relation to conventional

situational stressors such as health and family issues, as well as stress over trying to obtain social security benefits. (Tr. at 19, 25, 26, 27, 652, 670, 675, 689, 692, 693, 723, 724). However, her psychological symptoms and conditions were not so severe such as to result in medication adjustments, more intensive treatment, hospitalizations, or anything else that would demonstrate that the ALJ's analysis of Dr. Syed's opinion was unsupported by substantial evidence. In fact, not only could reasonable minds differ regarding the interpretation of the evidence in this case, but the record most strongly supports the ALJ's findings as opposed to Claimant's allegations. Having thoroughly reviewed the evidence and the opinions of Dr. Syed, the Court finds that the ALJ fully complied with the applicable regulations and rulings in assigning little weight to Dr. Syed's opinions.

### B. Manipulative Impairments

Claimant next argues that the ALJ purportedly disregarded the opinions of her treating physicians Drs. Levin, Kabbara, and Soulsby regarding her limited ability to perform fine and gross manipulation. (ECF No. 13 at 16-17). However, Claimant does not cite any specific medical records or opinions that the ALJ supposedly rejected, or even a category of evidence to support this assertion. (*Id.*).

In the decision, the ALJ acknowledged Claimant's wrist fracture in 2011 and subsequent carpal tunnel syndrome; he also noted her shoulder surgery and complaints of pain, weakness, tingling, difficulty reaching, and reduced grip strength in her non-dominant left hand. (Tr. at 70, 72). However, the ALJ discussed and cited evidence that Claimant's carpal tunnel release surgery in May 2012 appeared successful, she had only mild carpal tunnel syndrome, and was repeatedly documented to have normal strength. (Tr. at 71-73). In addition, the ALJ cited that Claimant extensively braided her hair daily, which demonstrated preserved dexterity in both hands. (Tr. at 71). Although Claimant

demonstrated reduced grip strength of 4/5 in her left hand during her consultative examination in August 2013, her grip strength was normal on examination in September 2014. (Tr. at 71-72). As far as her treatment, Claimant was only advised to wear wrist splints and take medication as needed for pain following her carpal tunnel release surgery. (Tr. at 72-73).

The Court finds that substantial evidence supports the ALJ's above analysis. As noted by the ALJ, following her carpal tunnel release surgery, Claimant was treated conservatively with pain medication and neutral position wrist splints at night. Although Claimant endorsed reduced grip strength at various times, her muscle strength tested normal throughout and her grip strength was normal bilaterally in September 2014. (Tr. at 685). Her nerve conduction studies as late as October 2015 showed only mild carpal tunnel syndrome that had not worsened over time. (Tr. at 46). The state agency physician that reviewed her records opined in October 2013 that while Claimant had some clinical indication of limitations in her left wrist, she had no manipulative limitations. (Tr. at 148). A second state agency physician affirmed such findings. (Tr. at 208-11).

Consequently, based upon a review of the evidence, the Court finds that substantial evidence supports the ALJ's analysis and findings regarding Claimant's alleged manipulative impairments.

## VIII. __Conclusion__

After a careful consideration of the evidence of record, the court finds that the Commissioner's decision is supported by substantial evidence. Therefore, the court **DENIES** Plaintiff's motion for judgment on the pleadings, **GRANTS** Defendant's request that the Commissioner's decision be affirmed, and **DISMISSES** this action from the docket of the Court. A Judgment Order shall be entered accordingly.

The Clerk of this Court is directed to transmit copies of this Memorandum Opinion to counsel of record.

**ENTERED:**  January 26, 2017

Cheryl A. Eifert
United States Magistrate Judge